## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **DEBBIE COLVIN, individually and** ) | |
| **as Personal Representative of the** ) | |
| **Estate of Oscar Colvin, Deceased** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No.: 4:13-CV-1458-VEH** |
| ) | |
| **PETERSON INDUSTRIAL, INC,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

This is a civil action filed by the plaintiff, Debbie Colvin, individually and as personal representative of the estate of Oscar Colvin, deceased. The plaintiff sues Peterson Industrial, Inc., her deceased husband's former employer, for alleged violations of the notice provisions of the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 U.S.C. § 1162, *et seq.*

The case comes before the court on the defendant's motion for summary judgment. (Doc. 37). For the reasons stated herein, the motion will be **GRANTED**, and this case will be **DISMISSED**.

## I.     STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there

is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry

2

of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the

non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.    THE OBJECTION TO/MOTION TO STRIKE THE PLAINTIFF'S EVIDENCE

Pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure, the defendant objects to and/or moves to strike certain evidence presented by the plaintiff in opposition to the motion for summary judgment. (Doc. 45 at 3-4). No response to the objections/motion has been filed by the plaintiff.[1]

---

[1] Pursuant to this court's "Uniform Initial Order," entered in this case on October 16, 2014 (doc. 22 at 23), said response should have been filed within 14 days after the objections/motion. It has now been been nearly three months since the objections/motion was made within the defendant's reply brief. No response has been filed.

It has long been the law in this circuit that, when deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence. In 2010, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c)(2). The advisory committee's note to Rule 56(c)(2) provides that:

> [An] objection [under Rule 56(c)(2)] functions much as an objection at trial . . . . *The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated*.

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis added).

Here, the defendant states:

> The following excerpts of the Affidavit of Dewayne Colvin are presented in a form which not be admissible ([d]oc 42 . . .):
>
> – "On the day in January of 2012[,] [that] this incident occurred, my [f]ather called me and told me he was about to talk with Sonny about bonus checks/commission[s] that Sonny promised [the] men for working jobs in Mississippi, and for bonus checks/commission[s] he promised to my [f]ather for working in South Carolina, Arkansas and

> > Mississippi[,] but had refused to pay[;]"
>
> > – "He [Oscar] told me 'Sonny is about to fire me' because he was going to ask for money that was owed to him and to the other employees[;]"
>
> > – "[M]y dad was calling Sonny a lying thief' and "[m]y dad was telling Sonny you fired me[.]"
>
> Furthermore, the transcript of a telephone conversation with a Blue Cross Blue Shield representative ([d]oc. 42 [at] 32-33) and Ms. Colvin's testimony regarding an alleged conversation with a representative of Gadsden Regional Medical Center ([d]oc. 40 [at] 9-10) would constitute inadmissible hearsay.

(Doc. 45 at 4-5). In addition,

> the [d]efendant objects to the extent that the [p]laintiffs rely upon excerpts from the [a]ffidavit of Dewayne Colvin which constitute improper lay opinion testimony, speculation[,] and are not based upon personal knowledge. Specifically, the affidavit stated the following:
>
> > – "I do believe that Sonny thought I would also quit because he knew I was angry with both of them[;]"[] and
>
> > – "[T]here was no misconduct in the way that they dealt with each other because this was common place [sic] between my [f]ather and Sonny[.]"

(Doc. 45 at 5-6).

The plaintiff has not responded to the defendant's objections. Therefore, the plaintiff has not met his burden to show that the evidence is admissible (or can be reduced to an admissible form) at trial. Because the plaintiff has failed to meet his evidentiary burden, the defendant's motion will be **GRANTED**, and this evidence will

6

be **STRICKEN**.[2]

## III.   FACTS

Peterson Industrial, Inc. ("Peterson Industrial") is an Alabama corporation located in Ashville, Alabama. Peterson Industrial installs equipment in poultry and meat plants. Peterson Industrial's shareholders are of Sonny Peterson ("Sonny") and Paula Peterson ("Paula"), who are married. Paula is the secretary/treasurer and handles the accounting and finances. As a part of her job, Paula handles most of the insurance issues. Peterson Industrial makes health insurance available to all of its employees. If, after a six month probationary period, the employee elects the health insurance coverage, Peterson Industrial will pay one half of the insurance premium.

Peterson Industrial has never had more than twenty (20) employees covered under its health insurance plan.  (Doc. 37-2 at 15 (Paula Peterson Deposition)).[3] The

---

[2] As will be shown, even if it had been considered, none of this evidence would have made a difference.

[3] The plaintiff disputes this fact, alleging that Peterson Industrial "employed 63 individuals during [p]laintiff, Oscar Colvin's employment and health insurance was made available to all of them." (Doc. 40 at 2). The citation she gives in support of this dispute is: "(Plaintiff's Exhibit B, Attached Exhibit 1 to said deposition)." (Doc. 40 at 2). "Plaintiff's Exhibit B" is the affidavit of Dewayne Colvin." (Doc. 42 at 47; doc. 41 at 1 (noting plaintiff's Exhibit B to be the affidavit of Dewayne Colvin)). It is not a deposition. It has no attachments. It in no way disputes the fact as stated by the defendant. The court notes that the plaintiff's exhibit "C," which is the deposition of Sonny Peterson, has attached to it, a document marked as "Plaintiff's Exhibit 1," which appears to be a list of 63 names and telephone numbers. (Doc. 42 at 79). The document is printed on the letterhead of Peterson Industrial, and the names and numbers fall under columns entitled "Employee Name," and "Employee Ph." respectively. (Doc. 42 at 79). There is no other information on this document. Even assuming that this is the exhibit to which the plaintiff actually refers, it is not authenticated. Further, nothing about this document

company did have over 20 employees total some time in 2012. (Doc. 37-2 at 46).

Sonny had known Oscar Colvin ("Oscar") since he was 4 or 5 years old–they grew up together. Sonny testified that he loved Oscar as a brother. Paula described Oscar as a friend. Oscar and Debbie Colvin ("Debbie") were initially married on June 20, 1994. They later divorced in 2007-08 and remarried on October 11, 2011.

Oscar began his employment with Peterson Industrial when Sonny saw Oscar at a service station and Oscar said that he needed a job. Sonny hired him the next day as a supervisor. Oscar was initially employed at Peterson Industrial from 2004 through January, 2008. In 2008, Oscar got mad about something and quit. Sonny went to Oscar later and requested that he come back. Oscar came back to work in July 2009, and worked until January, 2012, when he was terminated.

Sonny described Oscar as good employee and that he did his job. Sonny testified during his deposition that he gave Oscar "three verbal reprimands about Debbie driving the company truck because she was an uninsured driver and she wasn't on my driver's list, which is a big violation of our company policy, a written policy that Oscar had signed." (Doc. 37-1 at 52). There was also an incident where Oscar drove the company truck to a Bob Seger concert which was against company policy.

---

proves that Peterson Industrial "employed 63 individuals during [p]laintiff, Oscar Colvin's employment and health insurance was made available to all of them." At best, this document, if authenticated, might prove that each of the people on this list, at some point, was an employee of the defendant. Offered as it is, it proves nothing.

(Doc. 37-1 at 97). Sonny issued him a written reprimand. In response, Oscar cussed and said that "he wasn't signing the GD thing." (Doc. 37-1 at 54, 97).[4] Debbie has no knowledge "either way about any company policy about personal use of vehicles." (Doc. 42 at 9(28) (Debbie Colvin Deposition)).  Sonny would also receive complaints from the employees regarding how Oscar treated them. Sonny would counsel Oscar and try to calm him down.

Peterson Industrial learned of Oscar's cancer in July, 2011. Specifically, Sonny noticed that Oscar was turning yellow and did not look well. As a result, he told Oscar's son, Dewayne Colvin ("Dewayne"), who also worked at Peterson Industrial for a time, about his concerns and that Oscar needed to go to a doctor. Over the next few days, Peterson Industrial learned of Oscar's cancer diagnosis. Peterson Industrial allowed Oscar to take a leave of absence from July 2011, through December 2011. During this time, Oscar was given full pay of $2,000/week, health insurance, and allowed use of the company truck. In January, 2012, Oscar announced that he had been cleared of cancer and wanted to return to work.

When he came back to work, Oscar was sent to a project in Souderton, Pennsylvania. (Doc. 37-1 at 62). Sonny testified that "Oscar had a really bad attitude

---

[4] Debbie Colvin disputes this fact. However, the evidence to which she cites merely proves that she "was not aware" that Oscar was written up. (Doc. 42 at 9(28)).

9

on the project. He parked in a no parking zone in a loading entrance to the plant. When our customer[, a man named Taylor Peel,] asked him to . . . []move his truck from that parking area, he threatened the customer." (Doc. 37-1 at 62). Specifically, he told the customer, "I'll beat your eyes out you sissy SOB." (Doc. 37-1 at 64).[5] Sonny stated in his deposition that, after the job, someone "had to go back the day after it started up and relocate some piping to equipment." (Doc. 37-1 at 66). He testified that "[o]ur men put them in the wrong place." (Doc. 37-1 at 67).[6]

---

[5] The plaintiff disputes the facts in this paragraph with the statement: "Disputed. According to Dewayne Colvin, who also worked on this job, the work was done correctly because Oscar on the job [sic]." (Doc. 40 at 4). Nothing about this statement disputes the fact as stated by the defendant. Further, the cite given by the plaintiff is incomplete, stating only "(Plaintiff's Exhibit, page 2)." (Doc. 40 at 4). Assuming that the cite refers to the affidavit of Dewayne Colvin, which appears in the record at document 42, pages 47 through 49, nothing about that affidavit disputes Sonny Peterson's testimony on this point.

[6] The plaintiff disputes the facts in these last two sentences with the statement: "Disputed. According to Dewayne Colvin, who also worked on this job, the work was done correctly because Oscar on the job [sic]." (Doc. 40 at 4). Again, the cite given by the plaintiff is incomplete, stating only "(Plaintiff's Exhibit, page 2)." (Doc. 40 at 4). Assuming that the cite refers to the affidavit of Dewayne Colvin, which appears in the record at document 42, pages 47 through 49, the only part of that affidavit which supports this dispute is the following: "Sonny was also yelling that my Dad screwed up our last job in which was not correct because my [f]ather was the reason the job was actually done correctly in the end. In fact, my [f]ather stayed at the plaint for over 24 hours, making sure the work was done correctly." (Doc. 42 at 48). The affidavit fails to state that it is based upon the affiant's personal knowledge, and there is no foundation laid for how the affiant could know anything about this job. Although the plaintiff's brief states that Dewayne Colvin "also worked on this job," the affidavit does not say so, and there is no other evidence cited for how Dewayne could have personal knowledge of these facts. Further, even if the court were to assume that the affiant's use of the phrase "our last job" was sufficient to establish that Dewayne was present at the job at some point, the affiant does not explain in what capacity he was there, where he worked, or how long he was there. He does not establish that he was in a position to see or have any sort of judgment as to how the piping was done. Indeed, the affidavit does not even address the piping. The vague statement that the work was done "correctly," does nothing to dispute whether or not the piping was placed in the wrong

After the job was done, Peel contacted Sonny and told him what occurred and that he needed to "get a hold of Oscar." (Doc. 37-1 at 66). Sonny then called Oscar into the office to discuss his behavior on the Souderton project. Sonny testified at his deposition as follows:

> A.   That's when I called Oscar to the office and told him that we couldn't have that attitude and we couldn't be running off – those were our customers and he couldn't talk to people that way.
>
> . . .
>
> A.   I called him the night before he came into the office.
>
> Q.   Okay.
>
> A.   I told him that I'd had enough of his bad mouthing the customers and I had had enough of him bad mouthing me with the crews, that we needed to talk the next morning.
>
> . . .
>
> A.   [The next morning] Oscar walked in. I, again, reiterated that it had to stop. I didn't think that he was well. I wanted him to turn in his company truck, go home, come back and get his paycheck, and I would pay his insurance until he got well, but I couldn't tolerate that type of attitude from him anymore. I knew he was sick.[7]

---

location.

[7] The plaintiff disputes this fact stating that <u>Oscar</u> actually initiated the meeting, and went to talk to Sonny Peterson "about bonus checks/commission that Sonny promised men for working jobs in South Carolina, Arkansas[,] and Huntsville but refused to pay." (Doc. 40 at 4). The basis for this dispute is a phone conversation that <u>Dewayne</u> Colvin says that he had with his father shortly before the meeting when his father "told me he was about to talk with Sonny about [the] bonus checks/commission," and said that "'Sonny is about to fire me' because he was going to ask for the money that was owed to him and to the other employees." (Doc. 42 at 47-

Q.      What did he say?

A.      He proceeded to cuss and swear at me and told me he would just
        gut me. I asked him what he meant. He told me he would cut my
        guts out and went into another GD blankety blank blank blank.

Q.      What did you say?

A.      At this point, I told him he needed to calm down, think about what
        I telling him, and take what I was offering him. He had nothing to
        lose. He had a job when he got well. He needed his paycheck. He
        needed his insurance. I knew he was sick.

Q.      What did he say?

A.      He stood up and again cursed me again and told me he didn't need
        no pay, no insurance, nothing I had, that I was a sorry SOB and he
        would kill me in the next two years, watch my back.

Q.      So then what happened?

A.      I asked him to leave.

Q.      Did you curse at him?

A.      No, I did not.[8]

(Doc. 37-1 at 64, 68-69). Later in his deposition, when asked if Oscar did more than

---

48). As noted above, this evidence will be stricken. However, even assuming that the evidence is admissible, it does not dispute Sonny Peterson's account of what was <u>actually said</u> in the meeting. Dewayne Colvin claims no personal knowledge of the entire conversation, and even admits in his affidavit that he was not present for the entire conversation.

[8] Several "disputes" proffered by the plaintiff claim that Sonny Peterson was "cussing" at Oscar Colvin. (See doc. 40 at 4-5 (¶¶ 26, 27, 28). The only evidence cited in support of these statements is the affidavit of Dewayne Colvin, which in no way supports these assertions.

just verbally threaten him, Sonny stated that Oscar "reached into his back pocket to pull his knife out and told me he would gut me." (Doc. 37-1 at 74).

Dewayne Colvin heard some part of the conversation. He stated that, when he arrived, Sonny Peterson and his father "were standing outside at the doorway yelling and screaming at one another toe to toe write [sic] at each other." (Doc. 42 at 48). He continued:

> [T]hey were yelling at each other and I walked between them several times in an effort to stop them from arguing. . . . I walked back out of the building in between the two of them while . . . Sonny was telling my [d]ad he did not work there any longer. . . . Sonny was also yelling that my [d]ad screwed up our last job in which [sic] was not correct because my [f]ather was the reason the job was actually done correctly in the end. In fact, my [f]ather stayed at the plaint for over 24 hours, making sure the work was done correctly.

(Doc. 42 at 48).

It took approximately ten minutes to get Oscar out of the office. (Doc. 37-1 at 72). Sonny testified that Oscar Colvin "stopped at [someone named] Linda's office and threatened to gut her. I asked him to leave again, and some of the employees in the parking lot had made their way to the office. They saw what was going on and was getting him out of the office." (Doc. 37-1 at 72). Sonny stated that Oscar specifically told Linda "I will gut your bulldog ass if you get up, bitch." (Doc. 37-1 at 75).[9]

---

[9] The plaintiff disputes this statement, citing only Dewayne Colvin's statement in his affidavit that "I walked into the building to get keys to the truck and no one there seemed upset or concerned about anything that had transpired early between my [d]ad and Sonny." (Doc. 42 at

13

Debbie testified at her deposition that Oscar acknowledged that he and Sonny Peterson "got ill with each other and said things." (Doc. 37-4 at 9(34)). She described it as a ". . . mutual thing. [Oscar] quit. Sonny fired him." (Doc. 37-4 at 13(50)). Sonny testified that he was scared by this incident. (Doc. 37-1 at 73).[10] Peterson Industrial called the police and made a report concerning the incident. (Doc. 37-1 at 76-77).[11]

In a subsequent conversation, Oscar's son, Dewayne, acknowledged that Peterson Industrial had done everything that it could. Dewayne continued to work for Peterson Industrial for some time and never mentioned an issue about insurance coverage.[12]

---

48). Dewayne Colvin's opinion about who "seemed" upset does not dispute what his father said to Linda.

[10] The plaintiff disputes this statement citing to Dewayne Colvin's statement in his affidavit that Sonny Peterson "did not appear to be shaken, frightened, alarmed or in any way affected by the argument." (Doc. 42 at 49). Dewayne Colvin's opinion about how Sonny Peterson "appeared" does not dispute Sonny Peterson's testimony that he <u>was</u> upset by this incident.

[11] The plaintiff disputes this fact, citing to Dewayne Colvin's statement in his affidavit that Sonny Peterson "did not appear to be shaken, frightened, alarmed or in any way affected by the argument." (Doc. 42 at 49). Dewayne Colvin's opinion about how Sonny Peterson "appeared" does not dispute whether the police were called and a report was filed.

[12] The defendant offers the following fact:

34. Oscar declined the offer of Peterson Industrial to allow him to take a leave of absence. Specifically, Oscar said that he did not want anything that they had. (Exhibit B, p. 35, [lines] 4-14).

(Doc. 37 at 8). Although not specifically objected to, the court *sua sponte* strikes this fact as it is based upon hearsay–specifically Paula Peterson's testimony as to what she was told happened during the conversation between Sonny Peterson and Oscar Colvin.

Oscar also told his wife, Debbie, that he did not need the health insurance. Oscar never made a claim for unemployment.

Paula Peterson testified at her deposition that either she or someone named April notified Blue Cross Blue Shield of Oscar's termination. (Doc. 37-2 at 38). Paula Peterson explained in her deposition that she has a practice of documenting everything that happens at the office. (Doc. 37-2 at 39). She testified that she noted on the COBRA election form that it was mailed on January 24, 2014. Paula Peterson documented Oscar Colvin's personnel file that day to note that the COBRA information had been sent to the plaintiff's address at 385 Mountain Springs Road, Ashville, Alabama 35953, by regular mail. (Doc. 37-2 at 40, 58, 64). She testified that she sent the forms herself (doc. 37-2 at 41), and that she mailed them "at Ashville at the box outside" (doc. 37-2 at 42).

Sonny Peterson also has firsthand knowledge of the mailing of the COBRA forms. In his deposition he testified:

A.   [Paula] came in and said she had to get Oscar his COBRA form mailed. She filled out the form. Paula files everything in everybody's employee file just like this and signs it and dates it.

     When she filled out her form – Paula comes to the office every day approximately noon, we go to lunch, and she mails her items when we do that. I was with her when she mailed this.

. . .

Q.      You were there when she actually mailed the envelope?

A.      Yes. I actually drove to the post office. That's our lunch routine
         every day.

(Doc. 37-1 at 93-94).[13]

Debbie did come by the Peterson Industrial headquarters one time when Sonny

and April were not in the office. Debbie Colvin testified in her deposition that she told

"April" at Peterson Industrial that she never received anything about COBRA from

Peterson Industrial. (Doc. 42 at 27(97-98)). Debbie states that she is "pretty sure" that

this happened in March or April of 2012. (Doc. 40 at 27(100)). Paula states that it

occurred in April of 2012. (Doc. 37-2 at 41).[14]

---

[13] The plaintiff disputes that these documents were <u>sent</u>, by arguing that she did not
<u>receive</u> them. She writes:

> The only documentation received by [p]laintiffs was a letter dated January 25,
> 2012[,] with Oscar's paycheck and the following information about Blue Cross
> Blue Shield insurance: "Also, your Blue Cross Blue Shield cancellation will be
> effective 2/1/12. If you have any questions regarding your insurance you will
> need to contact Blue Cross Blue Shield directly at the number listed on the back
> of your insurance card." (Plaintiff's Exhibit A, attached Defendant's Exhibit 1).

(Doc. 40 at 6 (¶36); *see also* doc. 40 at 6-7 (¶37), at 7-8 (¶39) (adding the language: "Neither of
the [p]laintiffs received anything from the [d]efendant about a COBRA notice," and the cite
"(Plaintiff's Exhibit A, pages 98-100)."

[14] Debbie stated in her deposition that she "called asking for COBRA," but never made
any written request for it. (Doc. 42 at 27(99-100)). Also, in her deposition she testified that the
only conversations regarding insurance that she had with Peterson Industrial was the one visit
she had with the employee named "April" (doc. 42 at 12(38-39)), and then some text messages
that she sent to Sonny Peterson (doc. 42 at 12(38-39)). The "call" she is referring to is the call to

Sonny and Paula never had a conversation with Oscar or Debbie regarding the health insurance.

## IV.    ANALYSIS

### A.    <u>Applicable Law</u>

The applicable law in this case was thoroughly set out by Judge Smith, in this district, in *Evans v. Books-A-Million*, 907 F.Supp.2d 1284 (N.D. Ala., October 29, 2012) (Smith, J.) (affirmed in part, vacated in part on other grounds).  Judge Smith wrote:

> The Consolidated Omnibus Budget Reconciliation Act, generally referred to by the acronym "COBRA," was enacted by Congress during 1985, but not signed into law by President Reagan until April 7, 1986. Among other things, the Act requires "qualifying employers" (generally defined as those persons or entities who or which employed twenty or more full-time equivalent employees during the previous calendar year) to offer "qualified employees" (and members of the employee's immediate family) the option to continue coverage under the employer's group health and dental insurance plans whenever a "qualifying event" causes the employee to lose such coverage. See 29 U.S.C. § 1161; *see also, e.g., Brown v. Neely Truck Line, Inc.*, 884 F.Supp. 1534, 1539 (M.D.Ala.1995). Examples of some of the "qualifying events" listed in the statute include a person's loss of group health or dental insurance coverage due to: (1) the death of the covered employee; (2) a divorce or legal separation of the covered employee that terminates the ex-spouse's eligibility for benefits; (3) a dependent child attaining the age at which she or he is no longer eligible for coverage under the employer's group plans; or (4), as in the present case, <u>the voluntary or involuntary termination of a covered employee for any reason other than "gross</u>

Blue Cross Blue Shield.

misconduct." See 29 U.S.C. § 1162(2); *Brown*, 884 F.Supp. at 1539; *Lloynd v. Hanover*, 72 F.Supp.2d 469, 478 (D.Del.1999). COBRA requires that the continuation coverage offered to the qualified employee extend at least eighteen months past the date of the "qualifying event." 29 U.S.C. § 1162(2)(A)(I). In addition to requiring that the qualified employee be given the option to extend coverage under the employer's group health or dental insurance plans for at least eighteen months past the date of a "qualifying event," <u>COBRA also mandates that the employee be given notice of his or her option to do so.</u> See 29 U.S.C. 1166. The employer must notify the health plan administrator within thirty days of the "qualifying event" that triggered the termination of the group health or dental insurance coverage of the employee; and, the health plan administrator must then notify the employee of his or her option for extended coverage within an additional fourteen days. See 29 U.S.C. §§ 1166(a)(1)-(2), 1166(a)(4), 1166(c); *see also* 29 C.F.R. §§ 2590.606–2(b), 2590.606–4(b)(1). <u>When, as here, the defendant-employer also is the administrator of the group health and dental insurance plans, those two periods are added together; in other words, the employer/plan administrator is allowed a total of forty-four days within which to provide notice to the former employee.</u> *See* 29 C.F.R. § 2590.606–4(b)(2). If the former employee is not provided the required notice within the time allowed by statute, he or she is afforded a private right of action. *See* 29 U.S.C. § 1132(c)(1).

*Evans*, 907 F.Supp.2d at 1289-90 (emphasis added) (footnotes omitted).

In this case, as in the *Evans* case, the plaintiff was terminated, and, although it is not specifically made clear by the parties, it appears that the Peterson Industrial is also the administrator of the group health plan it offers through Blue Cross Blue Shield. The plaintiff claims that Peterson Industrial did not provide sufficient COBRA notice to Oscar or Debbie Colvin.

29 U.S.C. § 1166, which sets forth the notice requirements under COBRA, states that notice must be provided, "In accordance with

regulations prescribed by the Secretary." Prior to 2004, the Secretary of Labor had not promulgated regulations defining adequate notice under § 1166; in the absence of any regulations, courts reasoned that employers need only "operate in good faith compliance with a reasonable interpretation of what adequate notice entails." *Degruise v. Sprint Corp.*, 279 F.3d 333, 336 (5th Cir.2002) (internal quotations omitted).[15] However, now that regulations have been promulgated, employers, and the court, must turn to them for guidance.29 C.F.R. § 2590.606–4 sets forth the requirements for notice of the right to continuation coverage. As to delivery of notices, the regulation states that any notices required by the regulation "shall be furnished in any manner consistent with the requirements of § 2520.104b–1." The latter regulation provides that "the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals." 29 C.F.R. § 2520.104b–1(b)(1). Examples of such methods include in-hand delivery to the employee, first-class mail, and electronic delivery under certain conditions. *Id.*

*Griffin v. Neptune Tech. Grp.*, No. 2:14CV16-MHT, 2015 WL 1635939, at *10-11

(M.D. Ala. Apr. 13, 2015) (Thompson, J.).

## B. The Defendant Complied with COBRA Notice Requirements

### 1. *The Undisputed Evidence Demonstrates that COBRA Forms Were Mailed to Oscar and Debbie Colvin*

In the instant case, the evidence is undisputed that the COBRA forms were sent to Oscar and Debbie Colvin's address, via a method of delivery, first class mail, that is specifically set forth in the regulations as a means "reasonably calculated to ensure actual receipt of the material." The plaintiff has provided no authority for the

---

[15] This is the argument made by the defendant. (Doc. 37 at 11-15).

19

proposition that the defendant failed to comply with the statute because she did not

<u>receive</u> the materials.[16] Further, the plaintiff's rambling arguments regarding her

contacts and discussions with Peterson Industrial,[17] including alleging that she told

them that she had received no forms, have no bearing on whether these forms were,

---

[16] The parties have not cited, and this court has not found, any Eleventh Circuit case law on this issue. It is notable, however, that under the previous "good faith compliance" standard, courts had noted that the issue is not whether the former employee actually received notice, but whether the plan administrator "caused the notice to be sent in a good faith manner <u>reasonably calculated</u>" to reach the former employee. *Jachim v. KUTV Inc.*, 783 F.Supp. 1328, 1333–34 (D.Utah 1992) (emphasis added); *see also Lawrence v. Jackson Mack Sales, Inc.*, 837 F.Supp. 771, 783 (S.D.Miss.1992) (noting that methods of notification which are <u>reasonably calculated</u> to reach the employee or beneficiary are considered to conform to the standard of good faith compliance, and following the "view of the *Jachim* court that § 1166 does not require proof that the notices required by that section be received" and limiting its "consideration of the proof solely to the question of whether there is a genuine issue of material fact concerning [the defendant's] assertion that the notice was mailed."), *aff'd*, 42 F.3d 642 (5th Cir.1994); *Myers v. King's Daughters Clinic*, 912 F.Supp. 233, 236 (W.D.Tex.1996) (also noting that methods were <u>reasonably calculated</u> to reach the employee amounts to a good faith attempt, and concurring with the *Jachim* court's finding that § 1166 does not require proof that the notices be received), *aff'd*, 96 F.3d 1445 (5th Cir.1996); *Conery v. Bath Associates*, 803 F.Supp. 1388, 1398 (N.D.Ind.1992) (same); *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 977-78 (N.D. Ill. 1998) (same). Although this reasoning has never been specifically followed in the Eleventh Circuit, *Jachim* was discussed by the Eleventh Circuit in *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1231 (11th Cir. 2002). Notably the court did not reject that approach, but merely distinguished *Jachim* on its facts. Importantly, the "reasonably calculated" language in all of these cases is the same as that in the regulations that are now applicable. For that reason, and in the absence of Eleventh Circuit case law on point, the court holds that the same rationale should apply and that actual "receipt" is still irrelevant to the issue of compliance.

[17] She argues in her <u>brief</u> that she "contacted Peterson Industrial <u>several</u> times, once speaking with April who worked in the office, once taking COBRA paperwork she had received from the hospital to Peterson Industrial and left the same for Sonny, texted Sonny several times with no response and left messages for Sonny requesting a return phone call but received none." (Doc. 40 at 7). Elsewhere in her brief she discussed "Debbie Colvin's numerous phone calls and visits to [d]efendant's facility requesting COBRA." (Doc. 40 at 8). However, in her <u>deposition</u> she testified that the only conversations regarding insurance that she had with Peterson Industrial was the one visit she had with the employee named "April" (doc. 42 at 12(38-39)), and then some text messages that she sent to Sonny Peterson (doc. 42 at 12(38-39)).

or were not <u>sent</u>.[18] Finally, the plaintiff argues that "the COBRA form which was alleged to have been mailed to Oscar . . . does not have the section 'to be completed by employer' filled out so as to question whether or not this was ever mailed by [sic] Oscar." (Doc. 40 at 12). Whether or not a portion of the form was filled out in no way refutes the evidence in the record that the form was mailed.

### 2. *Debbie Colvin Was Not Entitled to a Separate COBRA Notice*

The plaintiff also argues that Debbie Colvin had to receive <u>separate</u> notice from the one sent to her husband. The defendant does not argue that it made two copies of

---

[18] The plaintiff also argues that she

> also contacted Gadsden Regional Medical Center and Blue Cross Blue Shield and was advised the employer stated it did not have enough employees for COBRA coverage. The employer's assertions is [sic] indirect [sic] contradiction to the information reported by contradiction to the information reported by [sic] thee [sic] two entities. Further, the information reported to Blue Cross Blue Shield was clearly in erroneous [sic] based upon the document listing 63 employees and testimony of Paula Peterson. Blue Cross and Blue Shield, who wrote the employer-provided policy, specifically told the [p]laintiff "COBRA is determined by the employer. If you're . . . eligible for it they would have to give you that information and actually based upon the group size there's actually no [COBRA] offered on this policy. The – policy is, er the employee, er the employer's company is too small, um, so there is not a way to continue this policy.

(Doc. 40 at 11-12). Other than the phrase "the document listing 63 employees and testimony of Paula Peterson," all the statements in the above quote are based upon evidence which will be stricken. Accordingly, these arguments will not be considered. Further, as noted in footnote 3 *infra*, her reference to "the document listing 63 employees" carries no evidentiary weight. Finally, the vague reference to "the testimony of Paula Peterson" is meaningless. Regardless, all of these arguments, even if they are considered, go only to whether the defendant had enough employees to be required to give COBRA notice to the plaintiff. The defendant makes no argument that it did not have enough employees to fall under the requirements. On the contrary, as noted, it argues that it complied with the statute by sending the notice.

21

everything and sent them, under separate cover, to Debbie and Oscar Colvin, separately. However, it seems reasonable under the circumstances, that, since it is undisputed that Oscar and Debbie Colvin were married and lived together at the same address to which at least one copy of the documents were mailed,[19] the requirements of the statute were satisfied. As has been noted,

> no purpose would be served by requiring a separate mailing to each individual beneficiary or requiring a separate form for each beneficiary. A single notice sent to a household containing more than one beneficiary is reasonably calculated to inform all qualified beneficiaries living at that address of their COBRA rights if the notice allows all beneficiaries to elect coverage.

*Conery v. Bath Associates*, 803 F. Supp. 1388, 1399 (N.D. Ind. 1992).[20]

### C.   Even Though the Defendant Complied with the COBRA Notice Requirements, It Had No Duty To Do so Because Oscar Colvin Was Terminated for "Gross Misconduct"

As noted previously, if Oscar Colvin was terminated for gross misconduct, then his termination was not a "qualifying event," under COBRA. See 29 U.S.C. § 1162(2). In the absence of a "qualifying event," there is no duty to provide a COBRA notice. Having found that the defendant did in fact comply with the requirement that it send notice to both Oscar and Debbie Colvin, the court also notes, in the alternative, that

---

[19] Debbie Colvin testified at her deposition that she and Oscar lived together at 385 Mountain Springs Road. (Doc. 37-4 at 4(14)).

[20] The parties have not cited, and this court has not found, any Eleventh Circuit case law on this issue.

it had no duty to do so because Oscar Colvin was terminated for gross misconduct.

It has been noted that "COBRA . . . does not provide a definition of 'gross misconduct' and federal case law addressing the subject is sparse." *Zickafoose v. UB Servs., Inc.*, 23 F. Supp. 2d 652, 655 (S.D.W. Va. 1998). At least one court has found that

> Applying an ordinary meaning of the statutory terms, the adjective gross means outrageous, extreme or unconscionable. Accordingly, conduct is gross misconduct if it is so outrageous that it shocks the conscience. Such a definition necessitates a case by case fact-based analysis. One district court described gross misconduct as "misconduct beyond mere minor breaches of employee standards, but conduct that would be considered gross in nature." *Collins v. Aggreko, Inc.*, 884 F.Supp. 450, 454 (D.Utah 1997).

*Zickafoose*, 23 F. Supp. 2d at 655. Gross misconduct has been found where an employee used a company vehicle without authorization and while intoxicated. *Aggreko*, 884 F. Supp. at 454 ("Such conduct is wanton and a deliberate disregard of his employer's interest."). Certainly if the conduct in *Aggreko* constitutes gross misconduct, then threatening to "gut" your employer, while physically reaching for a knife, and/or telling a female employee that he will "gut your bulldog ass if you get up, bitch," also constitutes a "wanton and deliberate disregard of [the] employer's interest."[21]

---

[21] Of course, the plaintiff disputes the defendant's version of the events, stating that the two men would regularly yell and curse at one another. (Doc. 40 at 14). He argues that "[a] consideration of an employer's standards of behavior is relevant in determining misconduct."

The plaintiff contends that, even if Oscar was guilty of "gross misconduct," that would not affect her right to notice. In support of her argument she cites *Cabral v. Olsten Corp.*, 843 F. Supp. 701 (M.D. Fla. 2010), in which the Florida district court stated that "Congress enacted COBRA as a remedial statute to provide insurance coverage to terminated employees and their families or to the employee's spouse and dependents regardless of the circumstances of the employee's termination." *Cabral v. Olsten Corp.*, 843 F. Supp. 701, 704 (M.D. Fla. 1994) (*citing Mlsna v. Unitel Communications, Inc.*, 825 F.Supp. 862, 864 (N.D.Ill.1993) *aff'd in part, rev'd in part*, 41 F.3d 1124 (7th Cir. 1994)). In *Mlsna*, the district court wrote:

> There is no case law to support the conclusion that when an employer terminates an employee for gross misconduct, the employer's duty to provide the employee's spouse with COBRA notification is excused. This interpretation seems unlikely in the context of the legislative history. Congress wanted to protect spouses and dependents of employees from abruptly losing health care coverage. It appears unreasonable that the action of the employee could excuse the COBRA protection of the spouse. Furthermore, section 1163 defines a qualifying event as an event that but for COBRA would result in the loss of coverage of a qualified beneficiary. 29 U.S.C. § 1163. Clearly, Eileen Mlsna is a qualified beneficiary who but for COBRA would lose health care coverage after her spouse's employment terminated.

---

(Doc. 40 at 15). While the court agrees that the applicable standard of conduct in the workplace is important, as noted previously, Dewayne Colvin has no personal knowledge of what actually transpired during the entire conversation, because, he admits, he was not there for the entire thing. Further, there is no evidence that it was commonplace for Oscar Colvin to physically threaten to "gut" people in the office, or for events to be so serious that the police had to be called.

"Indeed, in applying COBRA, federal courts should take care to apply equitable principles and fashion remedies to make injured parties whole." [*Swint v. Protective Life Ins. Co.*, 779 F. Supp. 532, 553 (S.D. Ala. 1991)]. Congress did not intend COBRA to be "exhaustive, inflexible rules concerning one's right to elect such coverage." *Id.* at 553 n. 53. Interpreting COBRA in light of Congressional intent, it logically follows that an employee's spouse should, at the very least, receive COBRA notification before her health care coverage terminates. Therefore, Unitel should have notified plaintiff of her COBRA rights before terminating her health care coverage.

*Mlsna*, 825 F. Supp. at 865.

On appeal, the Seventh Circuit reversed, writing:

the district court held that even if Mallin had fired Theodore for gross misconduct Unitel still had to notify Eileen of her right to elect continuation coverage. The court stated that Congress had enacted COBRA to "protect spouses and dependents of employees from abruptly losing health care coverage" and "[i]t appears unreasonable that the action of the employee could excuse the COBRA protection of the spouse." 825 F.Supp. at 865. We find that the court's holding conflicts with the plain language of the statute and cannot be supported. Under COBRA, an employer must give notice and extend continuation coverage only after the occurrence of a qualifying event. 29 U.S.C. §§ 1161(a), 1166(a)(4). The statute explicitly excludes termination for gross misconduct as a qualifying event. 29 U.S.C. § 1162(3). Nowhere does the statute indicate that a qualified beneficiary has a right to notice in any circumstance other than a qualifying event. We cannot look to legislative history to demand more of employers than Congress has seen fit to require.

*Mlsna v. Unitel Commc'ns, Inc.*, 41 F.3d 1124, 1129 (7th Cir. 1994). In the absence

of Eleventh Circuit authority on this issue,[22] the court agrees with this interpretation

---

[22] The parties have cited none, and this court has found none.

and holds that there is no requirement that Debbie Colvin receive a COBRA notice since Oscar Colvin was fired after having committed gross misconduct.

## V.    CONCLUSION

Based on the foregoing, the motion for summary judgment will be **GRANTED**, and this case will be **DISMISSED** with prejudice. A final order will be entered.

**DONE** and **ORDERED** this 2nd day of July, 2015.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge